2011-1069 MCORE CORPORATION v. ITC Good morning, Your Honors. Like this Court's recent decisions in Stonestrong and in Rejal, this patent is for a combination of known components to solve a known problem, producing predictable results. The alleged invention is the use of a multi-mode laser to reduce noise in multi-mode fiber by using multi-modes to destroy coherence. The alleged non-obvious step is the substitution of a vertical cavity surface-emitting laser for the prior art lasers. But as the appendix notes at JA3465 and JA3386, multi-mode fiber doesn't care what the source of the multi-mode emissions are. It's multi-mode emissions produced by any means. You know, it would help me given that there is certainly an issue between the parties as to whether when we refer to multi-mode we're referring to transverse, longitudinal, or both. It would help me if you would rather just say multi-mode because it's just ambiguous if you would say which you're referring to each time you refer to it. Sure. The alleged invention is the substitution of multi-mode transverse emissions for multi-mode longitudinal emissions. Even though the record shows, the only record sites, shows that multi-mode fiber doesn't care which type of multi-mode emission it is. Once it gets into the fiber, it works the same way. So this idea that somehow transverse and longitudinal are an issue of importance came up during cross-examination with the ALJ, it wasn't briefed. But there was no record evidence other than what we cited to in our brief with regards to whether the fiber cared. The fiber doesn't care whether it's multi-mode transverse or multi-mode longitudinal. Perhaps in our mind at least, the key emission made by the ALJ and we cited in our brief was his failure to consider JA744, which is the lab book of one of the inventors, Mr. Han. And at JA744, he documents the alleged invention and says, advantages, low coherence due to many transverse modes similar to SPLD high power. So what he's saying is that the advantages of his invention is it produces many transverse modes similar to SPLD, which are the edge emitting lasers that produce longitudinal modes. The whole idea behind this invention, if it's an invention, was that the newly introduced VCSELs could be substituted for edge emitting lasers to produce the multi-mode emissions needed by multi-mode fiber. Again, the record is clear. There is no citation that we're aware of in the record other than JA3465 and JA3386, which state that fiber doesn't care whether it's multi-mode transverse. This is a question of fact, whether the references teach away or not. And so we have to give a large degree of deference to the fact finder below. And some of the references do say things like, quote, for most applications, a single transverse mode emission from the VCEL is essential because it facilitates higher coupling efficiency with optical fibers and eliminates noise and instability due to mode competition. Another reference says, to satisfy most application, VCELs are required to operate in single transverse mode. Now, how do you get around those sentences arguably providing the substantial evidence to support the ultimate version? Because those references refer to the fact that you need single-mode laser emissions for single-mode fiber. You can't use single-mode emissions for multi-mode fiber. It won't work. You get noise. And so those teachings are only directed to the use of VCSELs when used with single-mode fiber, exactly what happened in the Patent Office. And if I can submit Judge Moore, the appellee here is seeking to mislead this court just as it misled the Patent Office. In the Patent Office, they got a rejection based on BAMWO. And they came back with two references that said, no, no, no, you want VCSELs for single-mode. You don't want multiple-mode. And omitted in their argument the fact that both references were talking about the use of VCSELs for single-mode fiber, which is what you use for long-distance transmissions. Each of the references directed to this court, just like the references directed to the PTO, deal with single-mode fiber. You can't use a single-mode emission with multi-mode fiber because the noise makes it unworkable. The transverse multi-mode operation, as I understand it, was regarded as problematical for some period in the development of laser technology. Isn't that true? In the 1980s, but not the 1990s. So the question is, where's the point in time in which somebody realized, number one, that this, what was previously regarded as a problem, an obstacle to be gotten over, was suddenly an advantage that could be exploited? And was there sufficient prior art development of that notion that this was an advantage that could be exploited to render obvious this invention? So could you point us to what it is that you think is the best evidence that you have that prior to the invention, there was art that recognized that there were advantages to multi-transverse mode transmissions? Yes, the multi-transmode transmissions were actually discussed by their own witness, Professor Deppie. Professor Deppie, in his testimony, testified that he was aware that this article discloses the use of 20 microns per... Which article is he referring to? He's referring to Maeda here. To which? Maeda. Maeda. But Maeda was not in before the ALJ, as I understand it, except to the extent that it was being used for impeachment, correct?  Yes, no. It was excluded. It was not excluded. It was not excluded. In fact, if I... I'm incorrect. I'm thinking there was an order excluding its use except for impeachment? No, what... Judge Rison, what happened is I tried to supplement the expert report with a reference to Maeda. The judge said, no, it's too late. You can't supplement the last minute. It sounds like an exclusion to me. Bear with me. But he said, since it's on your prior art list, we'll see how we use it during the trial. So what happened is during the cross-examination of Professor Deppie, it was used to impeach Professor Deppie's testimony. And what happened is we spent hours... You can probably see from that footnote in our brief where the judge said you've used it for almost every purpose, both sides. So what happened is it came in to impeach, but then we got admissions from their own expert that the state of the art at the time of the invention was to connect a multimode VXL to multimode fiber. That was his admission, Your Honor. And if Your Honor looks at... Multimode... Well, to attach a multimode VXL to a multimode fiber. And are we talking about multitransverse multimode now? There was a big dispute between Professor Deppie and Professor Chang as to whether the Mahater reference was multimode or not multimode. But the inventor... Multimode which? Transverse or longitudinal or either? It can only be transverse. Transverse. All right. A multimode VXL can only produce a multimode transverse emission. It cannot produce a longitudinal multimode signal? That's my understanding, Your Honor. And where we went back and forth in the trial, one of the things that I hope Your Honors noted is the co-inventor, Mr. Tang, when he was on the stand said, if you don't do something with a multimode transverse emissions, and we also got co-inventor Hong, again it's in the brief. Doesn't that depend on the bias? No, but that's their argument. Why doesn't it? Because you have to do something tricky with a bias to keep a multimode VXL with an aperture greater than eight microns from emitting multimode transverse emissions. And there was a big debate at the hearing, Your Honor, as to whether Banwell, if you may recall from the briefs, did or did not disclose a VXL with an aperture greater than eight microns. The co-inventor Hong admitted it disclosed a VXL with an aperture greater than eight microns. Professor Deppey disagreed with the inventor, but the inventor, Mr. Hong, in the citation in the record, admitted that Banwell disclosed a VXL with an aperture greater than eight microns, and co-inventor Tang, again it's in the briefs, Your Honor, admitted that unless you do something tricky, a VXL with an aperture greater than eight microns will naturally emit multimode transverse modes. Didn't the art teach moving away with VXLs with apertures that were that large? For single mode fiber, yes, Your Honor, not for multimode fiber, because in single mode fiber you have to have a single mode, transverse or longitudinal. With multimode fiber, you have to have multimode emission. I want to go back to MIATA for a second. On page 9601 of the appendix, I'm looking at the order from the ALJ. Yes, Your Honor. Furthermore, the ALJ notes that MCOR's proposed finding of fact is based on a reference that was excluded by the ALJ at the hearing, since MCOR did not rely on the reference in its pre-hearing brief or in any of its witness statements. MCOR now seeks to rely on this reference for invalidity purposes for the first time in its post-hearing brief, which is even more of an indication that MCOR is in fact seeking to substantively respond to complainant's rebuttals. MCOR's reliance on an excluded reference for substantive purposes is improper. That was from his January order, not from his final decision. In his final decision, he treated it as prior art. Well, no, no, he addressed it just in case we disagreed with his exclusion, right? I mean, he may have addressed it, but he didn't say, I changed my mind, it's in. He clearly excluded it, and then he went ahead and addressed it anyway, but that doesn't mean he has now allowed it. His January order is, as you quoted, his final order was not. The key here is we're depending not on May itself, but on Professor Deppie's admissions, that it teaches the connection of a vixal to multimodifier. Well, if the reference can't get in, it doesn't matter whether or not that expert testified that it teaches it or whether anyone, because the substance of the reference can't get in. So you can't sneak it in through testimony if you didn't put it on the witnesses. Judge Moore, I'm certainly not trying to sneak anything in, but what I tried to do, and what the court permitted at the hearing, is to use it for impeachment. We spent hours and hours on it, and we got their expert, the one he relies on, to admit that the state of the art, as of the time of the alleged invention, was the connection of a multimode vixal to multimode fiber. He admitted that, and that admission is in the record and impeaches his opinion, the very opinion relied upon by the ALJ. Then wouldn't it go to the jury as to whether or not to rely on, not the jury, the ALJ, as to whether or not to rely on that impeachment as successfully discrediting his testimony? So you've said, we can't look at it, you agree we can't look at it for the substance of the reference based on that exclusion order, but only for impeachment purposes. So if that's true, isn't the ALJ free to say, yeah, I don't think you've successfully impeached him? Your Honor, I don't, you know, as I said to Judge Bryson here in the court, I don't believe it was excluded because in the final order, he didn't refer to the exclusion. If you look at his order, his final order, he didn't refer to any exclusion. Instead, he treated it as prior art. I was happy that he did so, and I tried to argue on that basis. But even if it was excluded, and obviously it's the court's decision whether it's excluded or not. The point is that he agreed with our expert that multimodes were needed for multimode fiber, and that the state of the art at the time of the alleged invention was the connection of a multimode pixel to multimode fiber. So what you have then is the use of a, to me, an obvious use of a newly introduced multimode emitter that's necessary to be used with multimode fiber. There's no question a single mode emitter will not work with multimode fiber. Wasn't the state of the art at the time of the invention the use of edge emitting lasers as opposed to VXL transmissions? Absolutely, Judge. At the time, VXLs were still in the lab. It wasn't until many years later that VXLs became commercially available. The literature was discussing single mode VXLs for single mode emitters, but they weren't available yet. They were still lab toys. And the alleged invention here, the use of multimode VXLs for multimode fiber, as we said in the papers, was a paper patent because it wasn't until a number of years later these products became available. And that's admitted by the appellee at page 14 of its brief. Mr. Lord, you're well into, indeed, almost out of your rebuttal time. I will restore a couple of minutes. All right. I appreciate it. Thank you. We'll hear now from the opposing counsel, who will be, I think, speaking sequentially. Mr. Gerdin, you're going first, I believe? Yes. All right. And you have asked for eight minutes, if I understand correctly, on Mr. Florsheim's seven. Is that correct? That's correct. I split the time. May it please the Court, this is pretty much a classic case of improper hindsight reasoning here, trying to assert obviousness, looking at a time after the invention, as opposed to the proper focus of looking at the time of the invention. At the time of the invention, to solve the modal noise problem, the 447 patent applicants invented a claimed operable combination that completely went away from the teachings of the prior art at the time of the invention. At the time of the invention, to solve the modal noise problem, the prior art taught the use of, as you mentioned before, of prior art lasers, edge emitting lasers, such as SPLDs, or CD lasers, as well as LEDs. But edge emitting lasers, I suppose, are operating in longitudinal, multiple? Right, multiple longitudinal mode, which is clearly distinct from multiple transverse modes taught by the claimed operable combination. There's difference in laser profiles, laser cavities, the physical dimensions of the laser. There's just a polarity of differences between the two different lasers of an edge emitter and the claimed operable combination using a large aperture. Now, is it true that the Vixel, by virtue of its structure, is incapable of producing longitudinal transverse mode operation? Incapable of producing longitudinal transverse mode, it only produces spatial transverse mode. Longitudinal multimode, I'm sorry, not longitudinal transverse mode. It does produce a single longitudinal mode, but not multiple longitudinal modes. It only produces a single mode in the longitudinal direction? Right, it produces a single longitudinal mode, which is clearly distinct from the prior art teachings of multiple longitudinal modes in a single transverse mode. Again, as Your Honor already brought up, the record evidence is replete with different prior articles and publications teaching away from the claimed invention. Everything taught that you use either a prior edge emitter, or if you're going to use a Vixel, use it only in single transverse mode for stability considerations. I think you already quoted from their own expert joint appendix page 602, as well as joint appendix page 10359. Mr. Lord focuses down on Deppey's testimony and what Mr. Lord characterizes as his admission with respect to the state of the prior art. Could you address that question? I think there are a lot of statements taken out of context here, Your Honor. I think one of them was that, yes, it's physically possible to take a Vixel of a smaller aperture and fit it into a larger aperture of multimode fiber. Yes, it's physically possible, but there's nothing in the record that establishes that that was desirable to drive a larger aperture Vixel into multiple transverse mode. It's completely opposite. Everything teaches away for stability reasons, for noise reasons, relative intensity noise, the competition dynamics. Again, it's replete with MCOR's own expert witnesses' publications, as well as from the inventor's notebook. If you look at what they cite, joint appendix page 744, which talks about the noise problems in the prior art dealing with a large aperture Vixel driven into multiple transverse mode. Also, there's different types of noise at issue here. There's the modal noise and the optical fiber, but there's also two other types of noise in the laser itself, in the cavity, and also coupling to the fiber, which it was known that driving a larger aperture Vixel into multiple transverse mode had problems with that noise. So it was not desirable to use that for optical communication applications. I think a particular quote of their expert at joint appendix 602 deals with this when it talks about, for most applications, single transverse mode emission from the Vixel is what facilitates higher coupling efficiency with more optical fibers and eliminates noise and instability due to mode competition. And this is from? This is from joint appendix page 602. And this is MCOR's? MCOR's own expert. Expert. Correct. And that's clearly addressing the noise problems and instability problems of driving a larger aperture of Vixel into multiple transverse mode. Other evidence? Now, when you drive a larger aperture, you do so principally simply by increasing the gain, don't you? Isn't that the way you would do it? I think there's different techniques, but again, it's a... That may be an oversimplification. Right. It's complicated because, again, there's all these noise problems that were known in art and, again, I think it goes towards significance of the claim that mentioned that they overcame these problems to come up with this better solution to the modal noise problem. Okay. What about the Maeda reference? Right. Is it in? Is it out? Yes, your earlier statement is correct that it was out. It was put in for the limited purpose of impeachment. What does that mean exactly? I mean, if they're using Maeda to say the state of the art was different than what your expert was saying it was, then isn't that really relying on Maeda for substance? I mean, what's the difference? I'm having trouble distinguishing what difference there is if they're allowed to bring it in for impeachment of your expert with regard to what the state of the art is as opposed to relying on it directly for invalidity. Right. There's some ambiguity in the record. It was found, properly found to be waived, but regardless, it doesn't really add anything to the record. It doesn't establish... Well, it has a whole bunch of V cells, right, 20 or something. Right. It's correct, but there was no teaching that these larger aperture pixels were driven into multiple transverse mode. You think they're all single mode? Right. It was admitted by... You think it's 20 single modes? Right. It was, again, admitted by their own expert that she said repeatedly that... Isn't the reference ambiguous? I mean, I don't know if I could tell from the reference whether it was single or multiple. Certainly, the reference doesn't expressly say it, right? Right. It doesn't express it. Further towards a lack of clear convincing evidence there. Again, their own expert repeatedly said it was not the intention to reveal modes. The text didn't show whether it was single mode or multiple mode, and Abigail's own expert went into detail about why it is only single mode that is taught, getting into the spectral plots. In fact, there was dense wavelength, division multiplexing, as well as the limitation on the threshold current, which could only support single mode. So, one ordinary skill in the art would not look at this reference and think to use a large aperture pixel driven into multiple transverse mode. What about the question of the injunction and the issues raised by the appellant with respect to the ITC not using eBay standards in order to determine whether to issue an injunction or not? Right. Similarly, this issue was properly found to be waived. It was not raised at all in their remedy briefing to the commission. But regardless, expansion is controlling authority currently, even on appeal to the Supreme Court. The petition for cert is not relevant towards this issue of the commission's authority to issue remedy determinations. So, expansion is controlling authority. It's mandated by Congress that the commission consider the statutory enumerated public interest factors, which was done in this case to come up with the proper conclusion to issue a remedial relief against courts up to electronic products. So, it's a controlling authority and whether that argument was waived or not is pretty much irrelevant at this point. If we have no further questions, I think you've ended up exactly at the end of your time. So, why don't we hear from Mr. Fleish? Thank you. Thanks. Good morning, Your Honors. I'd like to address the technical issues again, if I might. Mr. Lorig said that once it gets into the fiber, the fiber doesn't care. Right. But what this argument ignores and keeps glossing over is there's more to these data transmissions, the optical data transmission systems than just the fiber. Here's a figure from the patent. It's JA-910. And what it shows is the data comes in here, goes into the laser, then it's coupled to the fiber, then it gets to the fiber. So, Mr. Lorig's argument is always, well, the fiber doesn't care. But you know what? Prior art taught, the laser cares and the coupling cares. And what the prior art taught consistently was you don't want to use multiple transverse modes because it creates what's called laser intensity noise, relative intensity noise in the laser, and it creates coupling problems. So, that's why you don't want to use multiple transverse modes. Without getting too far into the weeds, give me an idea of what that undesirable noise… what's the source of that undesirable noise? Characterize it for me so that I have an idea of what… Well, let me try it at this level. These systems communicate data in ones and zeros. Right. Right? And the ones and zeros are communicated by higher intensity light and lower intensity light. Right. If it burns a little brighter, it's a one. If it burns a little less intense, it's a zero. Let me see if I can finish your sentence, at least in terms that will make sense to me. And when you're dealing with multiple transverse modes, there's a risk that you'll muddy the water about the difference between the two levels. Right. And that's noise. And so, if junk goes into the fiber, it's going to be red of zero. It could be red as a one or a one could be red as a zero. And that defeats the whole purpose. You need to have what they call bit error ratio rates down in the one in a billion to be acceptable. All right. And so, their own expert, as counsel read before, wrote in her 1990 paper, this was not back in the 80s, this was 1990, that you don't want to use multiple transverse modes because it introduces these noise in the laser and coupling problems. And then again in 1993, which is the very year in which this patent application was filed, she wrote, their expert, wrote in another paper, the most important criteria, this is like the JA10359, the most important criteria for VCSELs to be useful in most applications is single mode emission. Single mode operation is important because multi-mode emission adversely increases laser intensity noise. And there's two other papers, the Lupta paper at Joint Appendix 11.025 and the Hadley paper at Joint Appendix 986 that say exactly the same thing. The existence of higher order transverse modes increases the RIN, the relative intensity noise. Now, does the, again forgive me for getting into the weeds again, but is the essence of the invention to conclude that we can live with the laser intensity noise because of the other advantages we get from transverse mode transmission, or is it that something about the use of the VCSEL makes the laser intensity noise less of a problem or both? I think both. Prior Art said don't do this because it creates this unwanted noise in the laser and it has coupling problems. And I've got, you know, Dr. Chang has again admitted coupling problems are very difficult. She said that in the same 93 paper. So what our inventors did was they, on that same page, 744, they said let's try this. But they noted in that same paper we've got to worry about the RIN, the relative intensity noise. So let's see if this works. And what they discovered was, contrary to conventional wisdom at the time, the RIN problems weren't that bad. The coupling problems weren't that bad. And actually you got terrific, terrific bit error ratios. Okay. Down in the 1 in 10 billion sort of range. Okay, that's fine. Thank you. Okay. So it was MCOR's burden to show by clearly convincing evidence that there would be a reasonable expectation of success in combining these things. The question is not could you physically connect the two. But the question is could you use that combination successfully to transmit data? And would a person with an ordinary skill in the art back at the time have had a reasonable expectation of that success? All this prior art teaches away. Inventors even recognized the danger in their lab notebook. MCOR did not prove that. And in fact, they have yet to find a single prior art reference that actually says that combining multi-mode laser, multi-transverse mode laser with a multi-mode fiber to transmit data would be a good idea. As Your Honor pointed out, these pieces of prior art, MEDA, doesn't show that. There was 24 pages of testimony in the record at Joint Appendix 3060 through 3071. And again at 3116 through 3127. 24 pages of testimony that MEDA operated in single mode. And our expert said you just have to look at the MEDA paper and look at the spectra there. And it shows it's operating in single mode, not multiple mode. And the Banwell and von Lehmann references don't teach what they claim they teach either. The judge so found properly. By the way, this idea that you have to get multiple modes if you have a laser over eight microns, the aperture over eight microns, is not really supported by the record. The Joule reference in the record at Joint Appendix 1672 reported getting single mode emissions from a VXL with a 16 micron aperture. So that's also not supported by the record of the statement made by counsel. Finally, if I have time, Your Honor, I would point out that the secondary and issue here are very strong evidence of non-obviousness. You had IBM own this market, this optical interconnect market. They were using the old style lasers. They owned it. It's a very sophisticated organization back in the 90s, full of scientists and engineers. They had every motivation to come up with the next best improvement to this sort of optical interconnect. They didn't invent this. They didn't realize this. They didn't discover this. Hewlett-Packard did. Hewlett-Packard was the owner of this patent originally. And totally displaced IBM from this market. This technology, this multi-transverse mode VXL technology is the basis for all these optical interconnects today. So if this was so all fired obvious, why would an organization as sophisticated as IBM not have realized that this was going to totally destroy their market? In addition, two of the inventors testify, and this is at Joint Appendix 3513 and 10182 that when they told others in the field about their invention, they were met with skepticism and surprise. Further evidence of non-obviousness. Thank you, Your Honor. Thank you, Mr. Laird. Mr. Laird, you have two minutes. Thank you, Your Honor. To begin with, I'd like to point the panel to JA3472 where Professor Chang, the author of the meta-reference, says that the multi-mode VXLs disclosed in the meta-reference were multi-mode. That's JA3472. I would also like to address the panel to JA3128 where Professor Deppie made the following admission, say he was their expert. But with a multi-mode fiber system, you can couple multi-modes from a VXL into a multi-mode fiber, correct? Yes, you can. I have a question. So since you're trying to use the reference to render obvious, does it matter if the person who actually did the experiment says something happened if the reference itself is ambiguous  It would have to be inherent, Your Honor. And co-inventor Tan said that if you have a VXL with an aperture over 8 microns, it'll be multi-mode unless you do something tricky. So it's inherent because you can make it... No, no. Inherent means not possibility, not even probability, but always happens. And you've just admitted it's not always happening because sometimes you can do something tricky and make it operate in single mode. I feel very awkward, but I believe Atlas Powder says not always, but it'll happen unless you do something to it to keep from happening. Atlas Powder, as I understand it, leaves open the possibility that you can do something tricky to make something not happen and still be inherent. But this isn't my place, Your Honor. I apologize. That's my understanding of Atlas Powder. At page 15 of our brief, we cited to some testimony from their own witness who said that there was a motivation to do this combination. You also agree that it was known to use VXLs in fiber optic links, correct? That it was being... Yes, it was being studied for that. And it was known to use VXLs in such optical fiber links because of potential for high speed modulation and because of coupling efficiency, correct? And he agreed. The references they point to as teaching away from the combination all talk about using VXLs with single mode fiber. Since it was proposed for single mode fiber, that's uncontested. All their references, they claim, teach away from using it for multi-mode. I'll say... If you could wrap up, Mr. Lord, we're well over your time. Right. So if it was... Finish this point. If it was suggested to use it for single mode fiber, it's just to use VXLs for single mode fiber, why not use them for multi-mode where you needed the multi-mode emissions that naturally occur with a VXL whose aperture is over 8 microns? Very well. Thank you. Thank you, Your Honor. The case is submitted. We thank all counsel.